**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EUROFINS PHARMA US HOLDINGS, INC.   )
and VIRALLIANCE, INC.,   )
   )
   )
   Plaintiffs,   )
   )   **JURY TRIAL DEMANDED**
   v.   )
   )   Civ. No. _____
BIOALLIANCE PHARMA SA,   )
VIRALLIANCE SAS, and   )
GILLES AVENARD,   )
   )
   Defendants.   )

## COMPLAINT

Plaintiffs Eurofins Pharma US Holdings, Inc. and Viralliance, Inc. (together, "Eurofins Group"), by their attorneys Morris, Nichols, Arsht & Tunnell LLP and Kasowitz, Benson, Torres & Friedman LLP, for their complaint against Defendants Bioalliance Pharma SA, Viralliance SAS (together, "BioAlliance Group") and Gilles Avenard, hereby allege as follows:

## PRELIMINARY STATEMENT

1.    This is a dispute arising out of the acquisition by Eurofins Group of certain biotechnology intellectual property assets from BioAlliance Group. The intellectual property at issue, among other things, tests, *in vitro*, drug susceptibility for HIV patients. In short, it assists in the development and administration of drugs used to treat HIV and Hepatitis B.

2.    Pursuant to a Technology Transfer and Commercialization Agreement entered on October 20, 2005 (the "TTCA"), Plaintiff Viralliance, Inc. ("VI," f/k/a Eurofins Viralliance, Inc. and referred to in the TTCA as "EVI"), acquired the intellectual property (the "IP," as defined in the TTCA) from BioAlliance Group. Plaintiff Eurofins Pharma US Holdings, Inc. ("EPUSH"), a parent company of VI, and as assignee of its affiliate Eurofins Scientific, Inc. (for purposes of

this complaint, EPUSH and Eurofins Scientific, Inc. are referred to together as "Eurofins"), committed to provide certain amounts of the capital needed to exploit the IP. (A copy of the TTCA is annexed hereto as Exhibit 1.) Under the TTCA, BioAlliance Group represented and warranted to Eurofins Group on execution of the TTCA (October 20, 2005) and again at the closing under the TTCA (December 15, 2005), among other things, that the IP was unencumbered and that BioAlliance Group was unaware of any third-party's claim that such IP or its use by BioAlliance Group infringed upon such third-party's rights.

3.      Subsequent to closing under the TTCA, Eurofins Group learned for the first time in late 2007 that prior to the execution of the TTCA, Advanced Biological Laboratories, S.A. ("ABL") had asserted a claim against BioAlliance Group that BioAlliance Group's use of the IP infringed upon certain of ABL's patents.  BioAlliance Group did not disclose that claim to Eurofins Group during the negotiations of the TTCA and, in fact, BioAlliance Group represented and warranted in the TTCA (two separate times) that no such claim existed.

4.      In January 2007, ABL filed suit against the US licensee of the IP, which lawsuit was settled in June 2008.  Aside from the damages arising from the ABL lawsuit and the subsequent settlement, BioAlliance Group's concealment of the ABL claim and the ensuing uncertainty as to the existence of other potential third-party claims against the IP has deprived VI (a company with limited resources and personnel), and thus Eurofins Group, of the full value of the IP, including the ability to sell or license it without accepting commercially unreasonable risks.  As a result of Defendants' wrongdoing and the inability to commercialize the IP, VI has failed as an enterprise as a practical matter.

5.      Eurofins Group's ability to sell or license the IP has been compromised further due to BioAlliance Group's assertion, remarkable as it may be, that it, and not VI, owns certain

technologies developed in connection with the IP that VI purchased pursuant to the TTCA.  That is, not only has BioAlliance Group defrauded Eurofins Group by failing to disclose ABL's claims against the IP, but now BioAlliance Group has the audacity to claim that the fruits of such IP actually belong to it.  Stated another way, BioAlliance Group's frauds destroyed any value the IP and Eurofins Group's related investment may have had to VI and Eurofins Group, but to the extent the IP does have any value, BioAlliance Group claims to be entitled to that.  It is far from clear what benefits BioAlliance Group suggests it actually transferred to Eurofins Group by way of the TTCA.

6.       BioAlliance Group's misrepresentation, failure to disclose, and breached representations and warranties made upon execution of the TTCA and repeated on closing of the TTCA give rise to claims both for misrepresentation and breach of contract.  Moreover, BioAlliance Group executive Gilles Avenard, who, in accordance with the terms of the TTCA, became a director of VI after the transaction contemplated by the TTCA closed, failed to come forward with the information he possessed about the ABL claim, thereby failing for a third time to properly inform VI and breaching his fiduciary duties to VI.  Eurofins Group seeks rescission of the TTCA or, in the alternative, compensatory and punitive damages for Defendants' deliberate wrongs. Additionally, and in the event the Court declines to order rescission, Eurofins Group seeks a declaration that the technologies developed by BioAlliance Group under that certain Technical Assistance and Research Agreement (the "TARA") are the property of VI. (A copy of the TARA is annexed hereto as Exhibit 2.)

## THE PARTIES

7.       Plaintiff EPUSH is a Delaware corporation, which is a holding company, and which has its address at 6100 Thornton Avenue, Suite 220, Des Moines, Iowa.  EPUSH is a

3

wholly-owned subsidiary of Eurofins Ventures, B.V., a private company with limited liability formed under the laws of The Netherlands, and the assignee of all rights, title, interests and obligations under the TTCA of Eurofins Scientific, Inc., a Delaware corporation and an affiliate of EPUSH with its principal place of business at 6100 Thornton Avenue, Suite 220, Des Moines, Iowa. As set forth above, for purposes of this complaint, EPUSH and Eurofins Scientific, Inc. are referred to together as "Eurofins." Eurofins is part of an international group which operates laboratories focused on bioanalytical testing.

8.      Plaintiff VI is a Delaware corporation with its principal place of business at 6100 Thornton Avenue, Suite 220, Des Moines, Iowa. VI was created by Eurofins and is the acquirer of the IP under the TTCA. VI is wholly-owned subsidiary of Eurofins.

9.      Upon information and belief, Defendant Bioalliance Pharma SA ("BioAlliance") is a societe anonyme formed under the laws of France with its principal place of business in Paris, France. BioAlliance is a specialty pharmaceutical company focused on the treatment of opportunistic infections in cancer and HIV. The company develops and commercializes innovative products which address drug resistance issues. BioAlliance maintains an office at 49, Bld. Du General Martial Valin, 75015 Paris, France.

10.     Upon information and belief, Defendant Viralliance SAS ("VirAlliance") is a simplified societe anonyme formed under the laws of France. VirAlliance is a wholly-owned subsidiary of BioAlliance. VirAlliance is engaged in the development and commercialization of products and services to assess viral and cancer drug resistance. Upon information and belief, VirAlliance is in the process of being liquidated, thereby adding an element of urgency to Eurofins Group's claim for rescission as stated herein.

11.     Upon information and belief, Defendant Gilles Avenard is a natural person who is a citizen of France.   Mr. Avenard is a director of VI, a Delaware corporation, and, upon information and belief, is a co-founder and the chief operating officer of BioAlliance and was the president and chief executive officer of VirAlliance.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this civil action insofar as there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

13.     This Court has jurisdiction over all Defendants because they purposely engaged in commerce and activities in this jurisdiction, and this litigation arises out of such commerce and activities.  Among other things, the contract at issue is governed by Delaware law, provides for a Delaware forum, provides Defendants with the right, which they exercised, to nominate a Board member of a Delaware corporation (Plaintiff VI), which itself was created for the purpose of performing the transaction at issue.

14.     This Court has jurisdiction over all Defendants pursuant to Rule 4(k)(i) of the Federal Rules of Civil Procedure and 10 Del. C. §3104, because each Defendant, in person or through an agent: (1) transacted business in this state; (2) contracted to supply services or things in this state; and (3) caused tortious injury in this state by an act or omission in this state.

15.     Pursuant to 10 Del. C. § 3114, authorizing service over directors, trustees, or members of the governing body of a Delaware corporation where the cause of action is based on such an individual's breach of fiduciary duty owed to the corporation and its owners, the court has jurisdiction over Gilles Avenard.

16.     Pursuant to 28 U.S.C. § 1391, venue is properly placed in this Court, as a substantial part of the events or omissions giving rise to the claim occurred in, and/or a substantial part of property that is the subject of the action is situated in this district, and because the complaint arises out of a contract in which the parties agreed that their rights and obligations thereunder would be construed in accordance with Delaware law.

17.     Pursuant to 28 U.S.C. § 1391, venue is additionally proper in this Court because all Defendants are subject to personal jurisdiction in Delaware and because all Defendants are aliens who may be sued in any district.

## **BACKGROUND**

I.     The Technology At Issue

18.     BioAlliance Group is a pioneer in the development of antiviral drug resistance testing technology.   At the time of the TTCA, BioAlliance Group owned and had exclusive worldwide rights to certain patents, know-how and other intellectual property and rights defined by the TTCA as the IP.   Part of the IP covers *in vitro* phenotyping tests -- so called assays, or tests -- to assess drug resistance of HIV type-1.   As relevant here, when an assay is performed, HIV is extracted from the patient's plasma and reconstructed to be tested for susceptibility to the drug, thus allowing an evaluation of the individual patient's sensitivity to a specific drug.   The specific technology developed by BioAlliance Group under the IP has been given the trademark name of Phenoscript®.

19.     At the time of the TTCA, BioAlliance Group had licensed the patents that are part of the IP to Specialty Laboratories Inc. ("Specialty Labs") for the United States and Canada (which license contained, in relevant part, a non-infringement representation and warranty and an indemnification obligation by BioAlliance Group in favor of Specialty Labs).   BioAlliance

Group also licensed such patents to Laboratoire Pasteur Cerba ("Cerba") for the European Union, Middle East, Africa and Oceania. BioAlliance Group, however, retained worldwide rights to continue to develop and exploit such patents directly on behalf of drug development organizations.

20.     The patents licensed to Specialty Labs and Cerba, together with additional intellectual property to which BioAlliance Group had worldwide rights (including the patents, trademarks, and know-how identified in the TTCA), are defined by the TTCA as the "Rights." The license agreements with Specialty Labs and Cerba, together with certain other agreements, are defined in the TTCA as the "Agreements." The Rights and Agreements together constitute the "IP" as defined in the TTCA.

II.     The Transaction At Issue

21.     Having built what it considered to be valuable business assets which required additional capital, personnel and other resources which BioAlliance Group did not have in order to be fully commercialized and achieve their full value, BioAlliance Group sought a buyer for the IP that would make the necessary investment (a large part of which would be used to pay BioAlliance under the TARA), assume the indemnification liability to Specialty Labs (which BioAlliance Group knew, but did not disclose, was a ticking time-bomb), and at the same time allow BioAlliance Group to benefit from the fruits of the investment (through annual consulting fees of up to $500,000 under the TARA, and through stock options set forth in Schedule 5A of the TTCA in the event the venture would become profitable).

22.     BioAlliance Group selected Eurofins as the buyer and the TTCA was signed on or about October 20, 2005. The TTCA, among other things, required Eurofins to "fund [VI] with

up to $4 Million and . . . provide services, at Eurofins' expense, in accordance with the Service Agreement." (Exhibit 1, p. 2.)

III.    BioAlliance Group's Representations and Warranties

23.    The transaction was negotiated by experienced counsel for both sides, and the negotiations included exchanges of drafts of the TTCA and a final in-person drafting session. At the final in-person session, BioAlliance Group was represented by Dominique Costantini and Gilles Avenard (executives of BioAlliance Group), Nicole Rueiner-Burle as counsel and Christian Policard as advisor. At the final in-person session, Eurofins Group was represented by Tom Burnell and Hugues Vaussy (executives of Eurofins) and Jonathan Lapin as counsel.

24.    Given the absence of due diligence materials other than BioAlliance Group's offering memorandum and the relative unfamiliarity of Eurofins with the sector targeted by the IP, Eurofins Group insisted on certain straightforward, but comprehensive, representations and warranties regarding the IP and its intended use. Eurofins Group's request initially was met with resistance on BioAlliance Group's part, but when it became clear that Eurofins Group would not enter the transaction without such representations and warranties, BioAlliance Group ultimately acceded, and represented and warranted on execution of the TTCA and again thereafter on closing under the TTCA, among other things, that the IP was unencumbered and that the IP and its use did not violate the intellectual property of any third-party. Specifically, Section 2 of the TTCA, "Representations and Warranties" provides in relevant part:

> (a) BioAlliance Group, on the one hand, and [Eurofins Group], on the other hand, each represents and warrants to the other the following:
>
> ...
>
> (5) Disclosure.  No representation or warranty by it contained in any Transaction Document or statement contained in any agreement, certificate, document or instrument delivered by it pursuant hereto contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein not misleading. *To the best of*

8

*its knowledge, there is no fact which could have a material adverse effect on either of [VI] or the IP which has not previously disclosed in writing by it*.

(b) In addition, BioAlliance Group represents and warrants to [Eurofins Group] the following:

...

(3) To the knowledge of BioAlliance Group, the IP is valid and enforceable and *the current use by BioAlliance Group or its licensees or sub-licensees* of the IP neither infringes on the rights of any third party nor constitutes an unauthorized use or misappropriation of any IP owned by or licensed to BioAlliance Group by any third party. *At the Execution Date, BioAlliance Group has not received, and on the Closing date BioAlliance Group shall not have received, any claim, existing or threatened that the use by BioAlliance Group and its assignees of the Rights*, and that the intended use by [VI] of the Rights will, (i) *infringe or violate any patent or trademark right* or contract right of any person or entity or (ii) infringe or violate (x) any copyright or trade secret right or intellectual property right of any person or entity or (y) any settlement agreements or judgments applicable to BioAlliance Group or by which its assets are bound.

(Emphases added.) (Exhibit 1, pp. 5-6.)

25.     So important was it to Eurofins Group that the IP was unencumbered and not subject to any claims, which was known to BioAlliance Group, that a delay was built into the transaction between the TTCA's execution and the closing of the transaction so as to provide BioAlliance Group with the time necessary to obtain all necessary third-party consents to effect the transfer of the IP to Eurofins Group.

IV.     ABL Pursues Its Claim

26.     In late 2006 after having made a significant commitment to the commercialization of the IP and having relieved BioAlliance Group of broad indemnification obligations to Specialty Labs (which would transform a contract of minimal commercial value into a financial disaster), Eurofins Group learned for the first time that on or about July 15 and August 23, 2006, ABL contacted Specialty Labs, the licensee of one of the patents included in the IP, and claimed that Specialty Labs' use of the Phenoscript® technology infringed ABL's US Patent Nos.

6,081,786 and 6,188,988, entitled "Systems, Methods and Computer Program Products for Guiding the Selection of Therapeutic Treatment Regimens."

27.     On January 27, 2007, ABL filed suit against AmeriPath, Inc., the corporate parent of Specialty Labs. In light of its contractual obligation to indemnify its licensee (assumed by virtue of the TTCA), VI stepped in to defend the action, and eventually began settlement negotiations with ABL. On January 15, 2008, VI's Board of Directors, including Defendant Gilles Avenard, authorized the continuance of settlement discussions with ABL, which culminated in a sublicense agreement between ABL and VI on June 25, 2008. That sublicense granted VI a non-exclusive license to US Patent Nos. 6,081,786 and 6,188,988 in consideration for substantial one-time payments as well as royalties (the "ABL Settlement License"). Because the ABL Settlement License is subject to confidentiality restrictions and Eurofins Group is required to obtain ABL's consent prior to disclosure, Eurofins Group is not able to annex the ABL Settlement License as an exhibit to this complaint. Eurofins Group intends to submit a copy of the ABL Settlement License in this action in due course.

IV.     BioAlliance Knew of ABL's Claim Prior to Entry of the TTCA

28.     In its settlement negotiations with ABL, Eurofins Group learned for the first time that in December 2004, ABL's licensing agent, Evidence Medical, approached BioAlliance Group (as the then-owner of the IP), and asserted that BioAlliance Group required a license from ABL with respect to the Phenoscript® products. Upon information and belief, Evidence Medical is no longer in existence. ABL further advised Eurofins Group that, in early 2005, ABL engaged the services of La Societe Bionest Partners ("Bionest"), and that Bionest also advised BioAlliance Group that BioAlliance Group required a license from ABL with respect to the Phenoscript® products.

10

29.     According to ABL, and in addition to the oral claims that were made by ABL to BioAlliance Group representatives, Bionest's relevant file contains at least one piece of written correspondence to and from BioAlliance Group reflecting the infringement claim articulated on behalf of ABL in late 2004 or early 2005.    Because the exchanges between Bionest and BioAlliance Group may be subject to confidentiality obligations, ABL has not been able to obtain the release of Bionest's file to Eurofins Group.    ABL has agreed to produce such file to Eurofins Group provided BioAlliance Group consents to such disclosure.    BioAlliance Group refuses such consent.

30.     Most recently, at a VI Board of Directors meeting held on July 22, 2008, BioAlliance Group executive and VI Director Gilles Avenard confirmed BioAlliance Group's refusal to consent to the release of the Bionest file, and stated as follows with respect to the ABL claim:

> [A]s a negotiating tactic in 2005, Mr. Sayada [an ABL representative] alleged that the Viralliance business infringed on ABL patents (in order to justify making a lower offer for the Viralliance assets), and ... at that time, [BioAlliance Group] had obtained legal opinions (which [BioAlliance Group] had not but would make available) that there was no infringement.

(A copy of the minutes is annexed hereto as Exhibit 3.)

31.     Mr. Avenard made these statements while his counsel was present, and his statements were recorded in writing by the Secretary of the meeting, Jonathan Lapin.    The minutes were signed by Jean-Louis Faudon, Chairman of the Board of VI.

32.     However, when the minutes for that meeting were circulated for approval, Mr. Avenard refused to sign the version signed by Mr. Faudon.    Instead, Mr. Avenard circulated his own "revised" version of the minutes, which state in relevant part:

> Mr. Avenard explained that [BioAlliance]'s consent to Bionest's disclosure request was withheld because the Bionest dossier contains confidential and sensitive elements of business negotiation relating to

[BioAlliance]'s effort to sell the Viralliance business and not relevant to VI, which was acknowledged by Jonathan Lapin.  Mr. Avenard went on to say that things were very clear with ABL patents and that they had nothing to do with Viralliance system.  It appeared that, in 2005, as a negotiating tactic, Mr. Sayada [an ABL executive] proposed a license on a complementary technology in order to enlarge the business perspectives, in the unique objective to justify making a lower offer for the Viralliance assets.

(A copy of the minutes signed by Mr. Avenard is annexed hereto as Exhibit 4.)

33.     Mr. Avenard's version of "revised minutes" stands in sharp contrast to what was said at the meeting and to the text of the minutes of VI's January 15, 2008 Board meeting (the "January Minutes"), signed by Mr. Avenard.  In the January 15, 2008 meeting, and as reflected in the January Minutes Mr. Avenard signed, Mr. Avenard confirmed that ABL made an oral claim of infringement in connection with those acquisition efforts.  The January Minutes state in relevant part:

> Mr. Avenard indicated that ABL attempted to acquire Viralliance SAS ("Viralliance") and after [BioAlliance] refused to sell it to ABL suggested orally, but never in writing, that Viralliance was infringing ABL's patents.

(A copy of the January Minutes is annexed hereto as Exhibit 5.)

34.     Though Eurofins Group denies the accuracy of Mr. Avenard's rendition of what occurred at the July 22, 2008 Board meeting, the "revised" minutes as well as the January Minutes nevertheless evidence an admission that BioAlliance Group, including Mr. Avenard, knew of ABL's claim prior to entry of the TTCA.  Whether BioAlliance Group or Mr. Avenard considered ABL's claim to be meritorious or merely a negotiating tactic is without consequence. BioAlliance Group represented that it had no knowledge of any claim that BioAlliance Group did not have the right to use or sell the IP, and the January Minutes as well as Mr. Avenard's version of the July 22, 2008 minutes make plain that BioAlliance Group and Mr. Avenard in fact had been made aware of such a claim prior to the TTCA.  Indeed, notwithstanding BioAlliance

Group's and Mr. Avenard's post-closing assertions that ABL's claim lacked merit, as a result of that very claim, the IP is encumbered by a sublicense from, and payment obligations to, ABL and VI's efforts to commercialize the IP were derailed. Additionally, the presence of ABL has rendered VI unable to engage in other transactions due to additional costs and uncertainty relating to VI's rights to use and sell or license the IP.

V.   Gilles Avenard Breached His Fiduciary Duties

35.   Immediately upon becoming a director of VI, Mr. Avenard undertook the fiduciary duties to which all corporate directors are subject, including the duty of loyalty and to act in the best interest of VI.

36.   Despite knowing of the serious claim ABL had advanced in late 2004 and early 2005 with respect to the IP, Mr. Avenard, in blatant violation of his fiduciary duties to VI, did not after becoming a director of VI (the third opportunity for him to make this critical disclosure) come forward with the information he had concerning ABL's claim. Given his participation in the negotiation of the TTCA, Mr. Avenard knew that it was crucial to VI and Eurofins Group that the IP was unencumbered by third-party claims. Mr. Avenard further knew that VI and Eurofins Group had entered the TTCA and Eurofins would be making a substantial investment in reliance on BioAlliance Group's and Mr. Avenard's representations that no such claims existed and that they took comfort in the fact that Mr. Avenard would have a continuing role after closing as a director of VI. Despite this knowledge, Mr. Avenard failed to come forward with the information he possessed concerning the ABL time-bomb, including on the various occasions the ABL claim was discussed among representatives of Eurofins Group and BioAlliance Group after ABL had filed its lawsuit against Specialty Labs.

37.    By continuing to conceal ABL's claim, Mr. Avenard not only improperly protected BioAlliance Group but also prevented VI from mitigating the effects of BioAlliance Group's misconduct in a timely manner, including, among other things, exercising its rights to rescind the transaction at an early stage, or seeking an amicable resolution with ABL prior to ABL's initiation of a lawsuit against VI's licensee that monopolized management attention and VI's other limited resources.

38.    Mr. Avenard's conduct was obviously motivated by his desire, as an executive of BioAlliance Group, to protect BioAlliance Group from liability to Eurofins Group under the TTCA, and to allow BioAlliance Group to avoid the inevitable disaster of its indemnification obligations to Specialty Labs, another consequence of the TTCA. Mr. Avenard's conduct was without regard to any ramifications to VI, the entity to which Mr. Avenard owed fiduciary duties as a director. Mr. Avenard's conflict of interest is evidenced by, among other things, the statements he made during the July 22, 2008 meeting of VI's Board of Directors, in which Mr. Avenard "explained that, acting as VI Board member, he considered the settlement [with ABL] favorable to the company [VI], but in his capacity of COO of BioAlliance, he wanted to abstain from voting this ratification, for the above-mentioned reasons." (Exhibit 4, p. 2.)

39.    Mr. Avenard's violation of his fiduciary obligations to VI has prejudiced Eurofins Group's prospects of selling or licensing the IP, as well as the reputation of Eurofins Group in the biotechnology sector.

VI.    BioAlliance Group Improperly Asserts Ownership of Technology Developed For VI

40.    In addition to the dispute surrounding the ABL claim, another dispute has arisen between the parties, further compromising Eurofins Group's ability to sell or license the IP.

41.     Under the TTCA, BioAlliance Group was obligated to transfer the IP to VI, and also to provide VI with technical and research support necessary for the successful exploitation of the IP.  That is, Eurofins Group provided the capital and BioAlliance Group provided the technical expertise to develop the IP, with the obligation to transfer the IP and related "know-how" to VI.  Such technical and research support was to be provided by BioAlliance Group personnel in accordance with the terms of the TARA.  In return, the TARA required VI to reimburse BioAlliance Group, subject to a budget, for the actual costs incurred in performing such services.  BioAlliance Group's invoiced consulting fees for 2005 and 2006 totaled $992,468.  For 2007, 2008 and 2009, the consulting fees were to be reasonably determined by the parties.  The TARA budgets limited the amount to be paid to BioAlliance Group, but they did not limit VI's rights or BioAlliance Group's TTCA or TARA performance obligations.

42.     To allow BioAlliance Group to perform its obligations under the TARA, the parties agreed to enter into a nontransferable, nonexclusive, fully paid license referred to in the TTCA as the "Technical Assistance License".  (A copy of the Technical Assistance License is annexed hereto as Exhibit 6.)  The TTCA as well as the Technical Assistance License made clear that such license was granted for the sole purpose of allowing BioAlliance Group's personnel to utilize the IP in order to further develop the IP for the benefit of VI.  (Exhibit 1, Section 1(e), p. 4, and Exhibit 6, Section 1, p. 1)

43.     Further, the TARA clearly provided that the technologies developed under the TARA, and all intellectual property relating thereto, would be owned by VI.  Section 7 of the TARA, entitled "Confidential Information; Employees/Other Consultants," provides in relevant part:

> 7.4  BioAlliance agrees to promptly disclose to [VI] all algorithms, formulae, processes, techniques, know-how, data and the like that it or any Consultant

learns, creates, reduces to practice or the like in connection with the performance of his/her research and/or services for [VI] and *BioAlliance agrees that all such intellectual property shall belong solely to [VI]*. BioAlliance assigns, and agrees to cause each Consultant it employs to assign, to [VI] any rights it/he/she may have to such intellectual property and agrees to assist [VI] as may be reasonably necessary to obtain and enforce patents, copyrights and/or other protection therefore, at [VI]'s costs.

(Emphasis added.) (Exhibit 2, Section 7.4.)

Section 8 of the TARA, entitled "Inventions," provides in relevant part:

8.2  BioAlliance shall ensure that *all results and proceeds from the technical assistance and research pursuant to this Agreement shall be owned by [VI]*, including the copyrights thereto, as work-for-hire. [....]

8.3  *[VI] shall own the technical assistance and research* and shall have the right to modify, edit, destroy, license, exploit or use in any way the technical assistance and research and the results and proceeds thereof without compensation to or consultation with BioAlliance or any Consultant.

(Emphases added.) (Exhibit 2, Sections 8.2 and 8.3.)

Section 6 of the TARA, entitled "Non-Competition," provides in relevant part:

BioAlliance agrees that . . . none of BioAlliance, BioAlliance's subsidiaries or affiliates or their respective officers not members of BioAlliance Board of directors . . . shall, in any manner, be interested in or be associated (whether or not for compensation) with any other entity or person engaged in a business which is directly or indirectly competitive with the business of the Company or any of the subsidiaries or affiliates of the Company.

(Exhibit 2, Section 6(a).)

44.    Among the technologies developed by BioAlliance Group's personnel under the TARA at the request of VI, is an assay referred to as HIV-Phenoscript® - Integrase Inhibitor Assay (the "Phenoscript® Integrase Assay"). The Phenoscript® Integrase Assay is targeted at testing and optimizing drugs that block (or "inhibit") the action of integrase, a viral enzyme which is responsible for the spread of HIV and its integration into a patient's healthy cells. The Phenoscript® Integrase Assay was developed specifically with a view to support the development and administration of Isentress (Raltegravir), a drug developed by Merck & Co,

Inc. and the first integrase inhibitor approved by the United States Food and Drug Administration.

45.     As relevant here, the Phenoscript® Integrase Assay is an assay developed in connection with the IP.  Among other things, (i) it was created by BioAlliance Group personnel working on behalf of VI under the TARA and the Technical Assistance License, (ii) it is related to and/or part of the IP transferred under the TTCA, including the assays covered by that IP, and (iii) it was created using the "Know-How" transferred as part of the IP under the TTCA (and in fact could not have been created without such Know-How).

46.     By BioAlliance Group's own admissions, the Phenoscript® Integrase Assay was developed under the TARA.  Among other things, an activity report prepared by BioAlliance Group personnel and sent to Eurofins Group on July 3, 2007 specifically lists the Phenoscript® Integrase Assay under "Work performed under TARA in 2007" as well as under "Objectives under TARA for Q3 and Q4 2007."

47.     Nonetheless, in a letter dated July 31, 2008, presumably provoked by VI's demand for all documents related to the IP in order to create a data room in connection with its efforts to sell or license the IP, Gilles Avenard informed Eurofins Group that BioAlliance Group had decided "to file as soon as possible a new patent application for this new phenotyping assay for integrase inhibitor" and that BioAlliance Group was "open to discuss the assignment [to VI] of the rights relating to this new patent application."  In the ensuing discussions, BioAlliance Group took the position that the Phenoscript® Integrase Assay was developed outside and went beyond the scope of the TARA, and that VI could purchase the Phenoscript® Integrase Assay, and all rights thereto, for additional compensation.

48. The dispute over the ownership of the Phenoscript® Integrase Assay has now further compromised VI's ability to engage in any transactions to sell or license the IP, including all inventions made under the TARA.

49. In light of the clear and unambiguous language of the TARA and BioAlliance Group's own admissions that the work performed to develop the Phenoscript® Integrase Assay constitutes work under the TARA, there can be no doubt that the Phenoscript® Integrase Assay, and all intellectual property related thereto, properly belongs to VI.

50. If the Phenoscript® Integrase Assay constitutes work outside of the TARA (which it categorically is not), BioAlliance Group's use of the IP to develop the Phenoscript® Integrase Assay for itself would then constitute an unlawful infringement of the IP, including but not limited to the "Know-How" as defined in Section 1 of the TTCA. Given the limited scope of the Technical Assistance License, which allowed BioAlliance Group to use the IP only for the purpose of developing it on behalf of VI, BioAlliance Group could not develop the Phenoscript® Integrase Assay for anyone other than VI. Thus, if the Phenoscript® Integrase Assay does not belong to VI, as BioAlliance Group (incorrectly) contends, then necessarily BioAlliance Group infringed upon the IP, including the Know-How as defined in the TTCA, in order to create the Phenoscript® Integrase Assay.

51. A judicial declaration is necessary to establish VI's rights and the respective duties of BioAlliance Group regarding the Phenoscript® Integrase Assay.

## FIRST CAUSE OF ACTION
### (Fraudulent Inducement - Rescission)
(Against BioAlliance Group)

52. Eurofins Group repeats and realleges the allegations contained in paragraphs 1 through 51 as if fully set forth herein.

53.     BioAlliance Group falsely represented that "[a]t the Execution Date, BioAlliance Group has not received … any claim, existing or threatened that the use by BioAlliance Group and its assignees of the Rights, and that the intended use by [VI] of the Rights will, (i) infringe or violate any patent or trademark right or contract right of any person or entity …." (Exhibit 1, p. 6.)

54.     BioAlliance Group knew that its representations in the TTCA were false, or was reckless in making them, because, as discussed *supra*, BioAlliance Group had received letters and oral communications from no less than two different sources (Medical Evidence and Bionest) alerting it to ABL's claim that the use of the Phenoscript® technology infringed upon ABL's patents.  BioAlliance Group knew that at minimum, and regardless of what BioAlliance Group thought of the merits of ABL's claim, significant costs would be incurred under the indemnification to Specialty Labs were ABL to follow through with its claims.

55.     Furthermore, Gilles Avenard, a representative and agent for BioAlliance Group, later admitted that BioAlliance Group knew that the representations were false at the time they were made, as evidenced by the following:

a)      At the January 15, 2008 VI Board meeting, Mr. Avenard stated that "…ABL attempted to acquire Viralliance SAS ("Viralliance") and after [BioAlliance] refused to sell it to ABL suggested orally, but never in writing, that Viralliance was infringing ABL's patents" (Exhibit 5, p. 2);

b)      As reflected in the minutes of the July 22, 2008 VI Board meeting prepared by the Secretary of the meeting and signed by Mr. Faudon, Chairman of VI, Mr. Avenard stated that "…as a negotiating tactic in 2005, Mr. Sayada alleged that the Viralliance business infringed on ABL patents (in order to justify making a lower offer for the Viralliance assets) and that, at that time, BA had obtained legal opinions (which BA had not but would make available) that there was no infringement" (Exhibit 3, p. 2);

c)      While Mr. Avenard disputes the accuracy of the minutes of the July 22, 2008 VI Board meeting prepared by the Secretary of the meeting, even Mr. Avenard's "revised" version of those minutes reflect that he stated that "[i]t appeared that, in 2005, as a negotiating tactic, Mr. Sayada [an ABL executive] proposed a license on a complementary technology in order to enlarge the business perspectives, in

the unique objective to justify making a lower offer for the Viralliance assets" (Exhibit 4, p. 2).

56.    BioAlliance Group knew that Eurofins Group would not enter into the TTCA if they knew of ABL's claim because Eurofins Group insisted on the inclusion of the representation and warranty of "no claim."  Furthermore, BioAlliance Group knew that the potential cost of such a claim, even if unjustified, could be significant to VI, a start-up business, and could consume a substantial portion of the investment that Eurofins had committed to make in the IP and render this start-up company insolvent (which is precisely what happened).

57.    BioAlliance Group affirmatively misrepresented on two separate occasions that it had no notice of any such claims in order to induce Eurofins Group to enter into the TTCA. Likewise, BioAlliance Group failed on two separate occasions to disclose ABL's claim, and BioAlliance Group had an affirmative duty to make such disclosure.

58.    Eurofins Group, having expressed a strenuous interest in the disclosure of any existing or threatened claim and having insisted on the inclusion of a representation of "no claim," both actually and justifiably relied on BioAlliance Group's misrepresentations and omissions, and entered into the TTCA, with Eurofins ultimately having invested in the IP no less than $5,740,791, exclusive of interest.

59.    Eurofins Group later was obliged, pursuant to the indemnification obligation to Specialty Labs that it had assumed from BioAlliance Group, to litigate the pre-existing ABL claim against the Phenoscript® technology.

60.    In settlement of ABL's claim, VI was compelled to license ABL's patents, at great cost (which was paid with the proceeds from the sale of substantially all of VI's tangible assets, leaving VI with no assets other than the IP transferred under the TTCA).  This severely

constrained if not ended VI's ability to do business as planned under the TTCA, and injected

further uncertainty as to the future commercial viability of the Phenoscript® technology.

61.     Further, Eurofins Group's inability to warrant VI's rights to the Phenoscript®

technology has made sale or further license of the IP impossible, despite the existence of one

otherwise willing buyer.

62.     Eurofins correspondingly lost value in its investment in the IP, and VI has been

rendered illiquid.

63.     BioAlliance Group's fraudulent conduct, as alleged herein, was done

purposefully, maliciously, recklessly, among other things, for the purpose of fraudulently

inducing Eurofins Group to relieve BioAlliance Group of its indemnification obligations to

Specialty Labs relating to ABL, while retaining a stream of payments under the TTCA for

support of the Specialty Labs license and without regard for the rights and interests of Eurofins

Group.

64.     Because Eurofins Group would not have contracted with BioAlliance Group

absent the latter's misrepresentations and omissions, the Court should order the rescission of the

TTCA and all related contracts to return the parties to the *status quo ante*, with an award of

rescissionary damages, if necessary.

**SECOND CAUSE OF ACTION**
**(Fraudulent Inducement - Damages)**
(Against BioAlliance Group)

65.     Eurofins Group repeats and realleges the allegations contained in paragraphs 1

through 64 as if fully set forth herein.

66.     By reason of the foregoing, and in the alternative in the event the Court declines

to order rescission, Eurofins Group is entitled to a judgment for compensatory and punitive

21

damages against BioAlliance Group in an amount to be determined at trial, together with costs and interest at the statutory rate.

## THIRD CAUSE OF ACTION
### (Equitable Fraud)
(Against BioAlliance Group)

67.     Eurofins Group repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

68.     This claim also is brought in the alternative in the event the Court does not grant rescission.

69.     BioAlliance Group, as contract counter-party having Board representation and ongoing economic rights, owed Eurofins Group a duty of care to speak carefully and ensure that it was not making any untrue statements to Eurofins Group.

70.     Additionally, BioAlliance Group was in a position of unique and superior knowledge to Eurofins Group regarding information about claims against the IP.  As the owner of the IP (prior to the TTCA), BioAlliance Group had exclusive access to this information. Eurofins Group did not have access to similar information.

71.     A reasonable person in BioAlliance Group's position would have taken care to investigate whether any claims had been made against the IP prior to warranting that no claims existed.  While it defies logic and reason to assume that by the time the TTCA was negotiated and signed, BioAlliance Group had somehow forgotten about the claims that had recently been made by ABL, as such claims were made directly to Ms. Costantini and Mr. Avenard, BioAlliance Group breached its duty of care by failing to make a reasonable inquiry into whether it could accurately represent and warrant that no such claims existed.

22

72.     A reasonable person in BioAlliance Group's position would have taken care to conduct such inquiry and disclose any and all known claims to Eurofins Group. BioAlliance Group knew or should have known of the ABL claim, and BioAlliance Group breached its duty of care by failing to disclose it to Eurofins Group.

73.     When Eurofins Group entered into the TTCA, it did not know, and could not have learned other than from BioAlliance Group, about ABL's claim.

74.     Eurofins Group did not learn, and could not have learned earlier, other than from BioAlliance Group, of ABL's claim until some time after July 15, 2006, when ABL's agents sent letters to Ameripath, Inc., the corporate parent of a VI licensee of the IP, regarding the alleged infringement upon ABL's patents.

75.     Eurofins Group did not learn, and could not have learned earlier, other than from BioAlliance Group, about BioAlliance Group's pre-TTCA knowledge of ABL's claim until, in the context of settlement discussions arising out of ABL's lawsuit against Ameripath, Inc., ABL disclosed that its agents had at least twice advised BioAlliance Group, in writing, of its claims at some point prior to October 20, 2005.

76.     In entering into and then closing under the TTCA, Eurofins Group reasonably relied upon and was induced to proceed by the foregoing misrepresentations and/or omissions by BioAlliance Group, which were at best negligent and at worst intentional. Eurofins Group justifiably relied on BioAlliance Group's repeated representations regarding the IP and the absence of any existing or threatened claim.

77.     Eurofins Group has been damaged by BioAlliance Group's conduct, repeated misrepresentations, and omissions, which induced Eurofins Group to enter into, close under and to perform the TTCA.

78.     Because Eurofins Group would not have contracted with BioAlliance Group absent the latter's misrepresentations and omissions, the Court should order the rescission of the TTCA and all related contracts to return the parties to the *status quo ante*, with an award of rescissionary damages, if necessary.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)
(Against BioAlliance Group)

79.     Eurofins Group repeats and realleges the allegations contained in paragraphs 1 through 78 as if fully set forth herein.

80.     This claim also is brought in the alternative in the event the Court does not grant rescission.

81.     In the TTCA, BioAlliance Group represented and warranted, among other things, that:

> To the knowledge of BioAlliance Group, the IP is valid and enforceable and the current use by BioAlliance Group or its licensees or sub-licensees of the IP neither infringes on the rights of any third party nor constitutes an unauthorized use or misappropriation of any IP owned by or licensed to BioAlliance Group by any third party. *At the Execution Date, BioAlliance Group has not received, and on the Closing date BioAlliance Group shall not have received, any claim, existing or threatened that the use by BioAlliance Group and its assignees of the Rights*, and that the intended use by [VI] of the Rights will, (i) *infringe or violate any patent or trademark right* or contract right of any person or entity or (ii) infringe or violate (x) any copyright or trade secret right or intellectual property right of any person or entity or (y) any settlement agreements or judgments applicable to BioAlliance Group or by which its assets are bound.

(Emphases added.) (Exhibit 1, p. 6.)

82.     BioAlliance Group breached the TTCA by, among other things, failing to disclose, on execution and thereafter on closing, the existence of ABL's claim against the IP, and

repeatedly falsely representing and warranting that BioAlliance Group was unaware of any such claims concerning the IP.

83.    The TTCA is a valid and binding contract.

84.    Eurofins Group is not in breach of the TTCA and has fully performed its obligations thereunder.

85.    By reason of the foregoing, Eurofins Group is entitled to a judgment against BioAlliance Group awarding compensatory damages in an amount to be determined at trial, together with costs and interest at the statutory rate.

### FIFTH CAUSE OF ACTION
**(Breach of Fiduciary Duties)**
(Against Gilles Avenard)

86.    Eurofins Group repeats and realleges the allegations contained in paragraphs 1 through 85 as if fully set forth herein.

87.    As a director of VI, Mr. Avenard owed fiduciary duties of good faith, due care, and loyalty to VI, as well as to Eurofins as VI's sole stockholder.

88.    Mr. Avenard had knowledge of the ABL claim at all relevant times, including prior to execution of the TTCA, the TARA, and the Technical Assistance License.

89.    Mr. Avenard breached his fiduciary duties by failing to disclose the material information he possessed concerning ABL's claim to VI, its Board and its shareholders, subsequent to his appointment as director of VI.  Indeed, it was not until after Eurofins Group became aware of such claim in the course of its settlement negotiations with ABL in late 2007 that Mr. Avenard admitted his knowledge of such claim.

90.    The information regarding ABL's claim is of a nature that it would figure prominently in any person's decision to invest in the commercial exploitation of the IP, and

Mr. Avenard specifically was aware that VI viewed it as fundamental to its decision to enter the TTCA that no such claim existed.

91.     The existence of ABL's claim also was material to many decisions by VI's Board and VI's sole shareholder, Eurofins, made subsequent to Mr. Avenard's election to the Board, including each and every determination to inject Eurofins' capital into VI – the risks of which were to be borne by Eurofins but a portion of the benefits of which would be enjoyed by BioAlliance Group.

92.     For each decision Mr. Avenard reached as a director which affected the capitalization of VI or the exploitation of the IP, he did so by a grossly negligent or willful process, and in violation of his duty of loyalty to VI, that included the failure to consider all material facts reasonably available.

93.     Mr. Avenard's self-interest and improper conduct is further evidenced by the fact that each expenditure made by VI and Eurofins Group benefited BioAlliance Group, Mr. Avenard's company.  That is, under the TARA, Eurofins was to and did fund VI's work to develop and exploit the IP, and that involved paying BioAlliance Group to perform the further and necessary research and development of the IP and support of the Specialty Labs license.  By keeping silent as to the ABL claim, Mr. Avenard allowed VI and Eurofins to make expenditures for the benefit of BioAlliance Group, knowing all the while of the substantial risk that VI never would be able to utilize the IP for its own benefit because of ABL's claim.

94.     Moreover, Mr. Avenard knew that under the TTCA, Eurofins Group assumed BioAlliance Group's obligation to indemnify, among others, Specialty Labs for any claims of infringement arising out of the IP.  Thus, by keeping silent, Mr. Avenard protected BioAlliance Group's interest in avoiding its indemnity obligations to Specialty Labs, knowing all the while

that ABL had asserted such a claim that BioAlliance Group otherwise would have been required to defend and suffer the disastrous financial consequences of that obligation.

95.     In short, Mr. Avenard favored the interests of BioAlliance Group and himself over those of VI, and this violated his duty of loyalty to VI, and Eurofins as VI's sole stockholder.

96.     Mr. Avenard also deprived the remaining directors -- who hold a voting majority on the Board -- of such material facts, thereby effectively controlling the decision-making process through his omission.

97.     In failing to disclose this information, Mr. Avenard acted in bad faith, motivated by his desire, as an executive of BioAlliance Group, to protect BioAlliance Group from liability and to assure continued payments under the TARA, to the detriment of VI.  Indeed, in light of BioAlliance Group's fraudulent misrepresentation in the TTCA, Mr. Avenard was self-interested, and due to this self-interest and conflict, he failed to disclose the ABL claim and failed to consider the information available to him in making decisions as a director of VI, all of which resulted in significant losses to VI and Eurofins.

98.     Mr. Avenard's actions were grossly negligent and constitute mismanagement, corporate waste, and disloyalty.  Mr. Avenard's actions are not entitled to deference under the requirements of the business judgment rule and did not result in entire fairness both in procedure and substance.

99.     By reason of the foregoing, Eurofins Group is entitled to a judgment against Mr. Avenard awarding compensatory and punitive damages in an amount to be determined at trial, together with costs and interest at the statutory rate.

## SIXTH CAUSE OF ACTION
### (Declaratory Judgment)
(Against BioAlliance Group)

100.    Eurofins Group repeats and realleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

101.    Pursuant to Sections 7.4, 8.2 and 8.3 of the TARA, all results and proceeds from the technical assistance and research provided by BioAlliance Group to VI under the TARA, and all intellectual property related thereto, is the property of VI.

102.    By the admission of BioAlliance Group's personnel and representatives, the research performed to develop the Phenoscript® Integrase Assay constitutes work performed under the TARA, and the Phenoscript® Integrase Assay was at all relevant times intended and understood to be VI's property.

103.    Nonetheless, BioAlliance Group insisted in other recent correspondence that BioAlliance Group owns the Phenoscript® Integrase Assay, and that if Eurofins Group wants such property, it must license it from BioAlliance Group.

104.    As a result of the foregoing, there is an actual case or controversy between Eurofins Group and BioAlliance Group over which of them owns the Phenoscript® Integrase Assay.

105.    The determination of this matter is of immediate import and reality, both to settle rights between BioAlliance Group and Eurofins Group, but also in so far as it affects Eurofins Group's ability to license, collaborate with, or sell the IP.

106.    By reason of the foregoing, and solely in the event the Court declines to order rescission under a prior claim for relief, Eurofins Group is entitled to a declaration that the Phenoscript® Integrase Assay and all intellectual property related thereto are the property of VI.

## SEVENTH CAUSE OF ACTION
### (Infringement)
(Against BioAlliance Group)

107.     Eurofins Group repeats and realleges the allegations contained in paragraphs 1 through 106 as if fully set forth herein.

108.     In the alternative, should the Court determine that the Phenoscript® Integrase Assay constitutes work outside of the TARA and is the property of BioAlliance Group (which Eurofins Group disputes), BioAlliance Group's use of the IP for the purpose of developing the Phenoscript® Integrase Assay would then exceed the scope of the Technical Assistance License and violate the TTCA.  As a result, and only in the event that it is found that BioAlliance Group owns the Phenoscript® Integrase Assay, then BioAlliance Group would have infringed upon Eurofins Group's intellectual property rights, and Eurofins Group would be entitled to damages for such infringement of these rights, including the Know-How rights as defined in the TTCA.

## EIGHTH CAUSE OF ACTION
### (Conversion)
(Against BioAlliance Group)

109.     Eurofins Group repeats and realleges the allegations contained in paragraphs 1 through 108 as if fully set forth herein.

110.     Pursuant to Sections 7.4, 8.2 and 8.3 of the TARA, all results and proceeds from the technical assistance and research provided by BioAlliance Group to VI under the TARA, and all intellectual property related thereto, is the property of VI.

111.     By the admission of BioAlliance Group's personnel and representatives, the research performed to develop the Phenoscript® Integrase Assay constitutes work performed under the TARA, and the Phenoscript® Integrase Assay was at all relevant times intended and understood to be VI's property.

29

112.    Nonetheless, BioAlliance Group has refused the demands of Eurofins Group to recognize VI's rights in this property. BioAlliance Group insisted in other recent correspondence that BioAlliance Group owns the Phenoscript® Integrase Assay, that it has decided to file a new patent application relating to the Phenoscript® Integrase Assay, and that and that if Eurofins Group wants such property, it must license or purchase the rights from BioAlliance Group.

113.    Accordingly, BioAlliance Group has wrongfully exercised control and dominion over the property of VI, in denial of VI's rights.

114.    In the alternative, should the Court determine that the Phenoscript® Integrase Assay constitutes work outside of the TARA and is the property of BioAlliance Group (which Eurofins Group disputes), BioAlliance Group's use of the IP for the purpose of developing the Phenoscript® Integrase Assay would then exceed the scope of the Technical Assistance License and violate the TTCA. As a result, and only in the event that it is found that BioAlliance Group owns the Phenoscript® Integrase Assay, then BioAlliance Group would have wrongfully exercised control and dominion over the IP, for its own use and profit, and Eurofins Group would be entitled to damages for such conversion, including the value of the converted IP.

## PRAYER FOR RELIEF

WHEREFORE, Eurofins Group demands judgment as follows:

A.    On the First and Third Cause of Action, directing the rescission of the TTCA, and directing the return of the parties to the *status quo ante*, with an award of rescissionary damages, if necessary;

B.    On the Second Cause of Action, and in the event the Court declines to grant rescission, awarding Eurofins Group compensatory and punitive damages against BioAlliance Group in an amount to be determined at trial;

C.     On the Fourth Cause of Action, in the event the Court declines to grant rescission, awarding Eurofins Group compensatory damages against BioAlliance Group in an amount to be determined at trial;

D.     On the Fifth Cause of Action, awarding Eurofins Group compensatory and punitive damages against Gilles Avenard in an amount to be determined at trial;

E.     On the Sixth Cause of Action, declaring that the Phenoscript® Integrase Assay and all related intellectual property are the property of VI;

F.     On the Seventh Cause of Action, in the event the Court determines that the Phenoscript® Integrase Assay is the property of BioAlliance Group, awarding Eurofins Group damages for infringement of the IP in an amount to be determined at trial;

G.     On the Eighth Cause of Action, in the event the Court determines that the Phenoscript® Integrase Assay is the property of BioAlliance Group, awarding Eurofins Group damages in an amount to be proven at trial, including the value of the wrongfully converted IP;

H.     Awarding preliminary and permanent injunctive relief regarding any future use by BioAlliance Group of the Phenoscript® Integrase Assay;

I.     Awarding Eurofins Group its costs, including attorneys' fees incurred in this action;

J.     Awarding Eurofins Group pre- and post-judgment interest at the rate allowed by law; and

      K.    Granting Eurofins Group such other and further relief as the Court deems just and proper.

MORRIS NICHOLS ARSHT & TUNNELL LLP


*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
knachbar@mnat.com
   *Counsel for Plaintiffs*

Daniel P. Goldberg
Monica Bhattacharyya
Dorit Ungar
Kristina R. Juntunen
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
dgoldberg@kasowitz.com
mbhattacharyya@kasowitz.com
dungar@kasowitz.com
kjuntunen@kasowitz.com